Filed 7/30/14  P. v. Slape CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DARRELL RAVAN SLAPE,<br><br>    Defendant and Appellant. | A136669<br><br>(Humboldt County<br>Super. Ct. No. CR083870S) |

Defendant Darrell Ravan Slape appeals a judgment entered upon a jury verdict finding him guilty of sexual penetration by a foreign object of a person unconscious of the nature of the act (Pen. Code,[1] § 289, subd. (d)(4); count one); sexual battery by fraud (§ 243.4, subd. (c); count two); and misdemeanor battery (§ 242; count three).  The trial court sentenced him to a prison term of seven years.  He contends he was deprived of the effective assistance of counsel, that the trial court abused its discretion in denying his motion for a new trial and in excluding expert testimony, that he received inadequate accommodations for his hearing disability, and that his sentence constitutes cruel and unusual punishment.  We shall affirm the judgment.

---

[1] All undesignated statutory references are to the Penal Code.

1

# I. BACKGROUND

## A. Factual Background

Defendant committed his crimes against two victims, Jane Doe One and Jane Doe Two, while giving them massages at his business.[2]

Doe One had injured her psoas muscle,[3] which caused her pain from her lower back down to her thigh, and in 2007 was referred to Back in Action (or Healthy Life Alternatives), a business owned by defendant. During her first appointment, defendant told her he would give her a massage, and directed her to undress. He massaged the inside of her upper thighs as she lay on her back, and his hand brushed against her genitals a couple of times. He suddenly put his fingers inside her vagina, directly onto the area that was painful, and she was immediately in pain. A female physical therapist had performed internal massage of the knots inside Doe One's vagina in the past, but she had not given defendant permission to do so.

Defendant told Doe One to lie on her stomach and told her to lift her hips off the table. He again inserted his fingers into her vagina, causing her to have an orgasm. He told her to lie on her back again, asked her if he could massage her breasts, and did so. After the massage, Doe One tried to behave normally. She wrote a check to pay for the massage, made more appointments, and left. She was upset afterward, discussed the matter with her husband and pastor, and reported the incident to the police.

---

[2] In his briefing on appeal, defendant almost entirely ignores the facts underlying his convictions, instead limiting his "Statement of Facts" to an explanation of his massage therapy practice, a discussion of his hearing difficulties, a discussion of the testimony that his proposed expert witnesses would have provided, and a summary of the procedural history of the case. While recital of the facts of this case can be discomfiting, these facts are necessary to an understanding of the issues defendant raises on appeal, particularly his challenge to the exclusion of expert evidence on "referred sensation." We remind defendant's counsel of his obligation to set forth the significant facts in appellant's opening brief. (Cal. Rules of Court, rule 8.204(a)(2)(C).)

[3] The psoas is "a large flexor muscle of the hip-joint which arises from the lumbar vertebrae and sacrum and is inserted along with the iliac into the lesser trochanter of the femur." (12 Oxford English Dict. (2d ed. 1989) p. 755.)

Doe One had taken lorazepam (Adavan) that morning, and an Ambien tablet the previous night. The lorazepam relieved stress, but she did not otherwise feel its effects. She had not noticed any adverse effects from the Ambien, which helped her sleep. She had been prescribed, and occasionally took, other medications for migraines (Maxalt and Soma) and Percocet, but did not recall taking them before the incident. She also took Cortef, which she said was a hydrocortisone in tablet form, and which she said caused no side effects other than weight gain. Defendant presented evidence that some of the medications Doe One took acted as central nervous depressants and could affect memory.

Jane Doe Two was a massage therapist. She sought treatment for back problems in 2009, and defendant told her that since her insurance would not pay for his services, she could use some of his business's equipment if she gave him massages in return. After they spoke in his office, he told her he had a massage certificate and suggested they trade half-hour massages. While defendant was massaging Doe Two, he asked if she knew where her first "chakra" was. She said she did not, and he slipped his hand under the sheet covering her and under her underwear, and put his hand and finger at the opening of her vagina. He asked her to put her hand to his other hand, and asked if she could feel the vibration between them. She was upset, but after the massage she was afraid defendant might have locked the door or that he might pursue her if she tried to leave, and she decided to give him a massage before leaving. As she did so, he told her he wanted her to work on his chakra, took her hand, and placed it on his perineum. Doe Two told him she was not comfortable with that, and he asked her to continue massaging him. After the massage, Doe Two made more appointments with defendant because she was frightened that he would lock her up if he knew she was uncomfortable. She later reported the matter to the police.

Michael Drew, who had taught defendant massage therapy in 1996, testified that he taught his students that it is not appropriate to touch a client's genitals or massage a woman's breasts. However, internal or pelvic massage could be used as part of "trigger

3

point therapy,"[4] to search for painful spots that might be referring pain to other areas. A massage therapist should only do so under the supervision of a doctor or other licensed medical professional.

Drew testified on cross-examination that there can be trigger points in the perineal area. He also testified that it was possible that if a massage therapist activated a nerve in the lower spine area, a sensation could be felt in the genital area, and that some of the nerves that run to the genital area might run through the psoas muscle. If a cramped muscle was released, the client could feel both painful and pleasurable sensations in the genitals. A client who was having referred sensation would feel it both where the pressure was applied and in the area to which the sensation was referred.

Janette Johnson, a certified massage therapist and massage therapy instructor, testified for the People as an expert in massage therapy and professional standards of conduct. On cross-examination, she testified that when pressure was applied to a "trigger point," sensation could be referred to another site. When a muscle in the inner thigh area or perineum was activated, referred pain could be felt in the genitals.

M.G. testified that she received massage therapy from defendant in 1998, that he asked her to disrobe completely, and that over time, he focused his massages more on her crotch area and her breasts. On several occasions, as he worked on pressure points near her pubic area, he "hit" her genitals. After each massage, he would give her a hug in order to "crack [her] back," and on two occasions he kissed her.

Defendant testified in his own defense. He testified that he performed trigger point therapy on Doe One, and that it could be painful. He found trigger points in her right hip area, and "relieved the entrapment that was preventing circulation of the neuromuscular portion of her hip." When an entrapment was released, the client could feel sensations throughout the body. The psoas muscle encompassed the vagina, and when it was released, the client could experience sensation in the genitalia, because

---

[4] Drew explained that people develop trigger points from overuse injuries or acute injuries.

4

"those nerves that go to the genitalia actually go through the psoas muscle." This could result in a simulated orgasm. While he was massaging Doe One, he got no closer than three inches to her vagina, and he denied penetrating her. He massaged her right upper quadrant, but denied touching her breasts. When Doe One was on her stomach, he asked her to push her hips up into his hand so he could determine how much pressure she could withstand. He did not penetrate her as he did so, and he was not aware that she was having an orgasm. He believed both Doe One and Doe Two might have experienced referred sensation.

Defendant testified that Doe Two told him she was a massage therapist and that they agreed to trade massages. He said he was within a few inches of her genitals as he was massaging her, but denied touching them. He said Doe Two had asked for "chakra infusion," but that he was unable to "get to" chakra number one, located on the perineum, because of her body weight, so he went to chakra number two, just above the navel.

Defendant also testified that as part of the therapy he received for the effects of a broken back, a massage therapist regularly massaged his perineum. When Doe Two was massaging him, he placed her hand on his perineum.

## B. Procedural History

As to Doe One, the jury found defendant had committed the charged crimes of sexual penetration by a foreign object of a victim unconscious of the nature of the act (§ 289, subd. (d)(4)) and sexual battery by fraud (§ 243.4, subd. (c)). As to Doe Two, the jury found defendant not guilty of sexual battery by fraud (§ 243.4, subd. (c)), but guilty of the lesser included offense of misdemeanor battery (§ 242).

The jury rendered its verdicts on May 29, 2012, and the trial court initially set the sentencing hearing for August 3, 2012. Defendant filed a substitution of attorney on July 6, 2012, substituting Duncan James for his trial counsel, Jerold Schultz. Shortly thereafter, defendant filed a motion to continue the judgment and sentencing, supported by James's declaration that he needed additional time to review the trial transcripts in order to determine whether there were grounds for a motion for a new trial. On July 25, 2012, the trial court continued the sentencing hearing until August 15. Defendant filed

5

another motion to continue sentencing, on the ground that the trial transcripts were not yet available and that he was seeking additional testimony to support a motion for new trial. At the hearing on this motion, held August 8, 2012, the trial court denied defendant's request for an evidentiary hearing at the motion for new trial, ruling instead that the motion would be decided based on declarations. The court granted a continuance until August 31.

On August 10, 2012, defendant filed a third motion to continue the judgment and sentencing, on the ground that his new counsel had not yet received all the trial transcripts and that he needed more time to prepare expert witness declarations to support his new trial motion. An assigned judge heard the motion on August 17 and denied it without prejudice.

Defendant filed a fourth motion to continue the judgment and sentencing and motion for new trial, stating that he had received all but one of the trial transcripts, that his counsel needed time to read them in order to prepare a motion for new trial, and that he needed time to prepare expert declarations. He asked for a 60-day continuance. At the August 24, 2012 hearing on the motion, the trial court granted a continuance until September 14, 2012, and indicated again that it would not allow live testimony at the hearing on the motion for new trial.

Defendant filed his motion for a new trial on August 24, 2012. The motion was made on the grounds that defendant was unable to hear the trial properly and therefore could not participate in his defense, that his trial counsel rendered ineffective assistance by (1) not concerning himself with defendant's inability to hear, (2) not filing a points and authorities on the effects of spina bifida, a disease Doe Two suffered from, and (3) failing to advocate properly for the admission of the testimony of an expert witness, Dr. John Podboy, and that the lack of Dr. Podboy's testimony deprived him of a fair trial. Defendant submitted an expanded memorandum of points and authorities and additional evidence in support of the motion before the September 14 hearing. The expanded memorandum of points and authorities argued in addition that trial counsel rendered ineffective assistance in that he failed to advocate adequately for the admissibility of the

6

testimony of another proposed expert witness, Dr. Harry Friedman, that counsel was unprepared for trial in that he did not bring a laptop computer or a printer, and that counsel did not realize Dr. Podboy could testify about spina bifida. Defendant also argued that the trial court erroneously excluded the testimony of both Dr. Podboy and Dr. Friedman, and that the testimony of Doe One and Doe Two did not constitute substantial evidence that defendant had committed the crimes of which he was convicted. A supporting declaration asserted that trial counsel improperly challenged the originally assigned trial judge in order to accommodate counsel's own schedule.

At the hearing on the motion for a new trial, defendant unsuccessfully renewed his request to subpoena his trial counsel, Schultz, to testify at the hearing.[5] The trial court denied the new trial motion. The judge noted that defendant had received accommodations for his hearing disability: he had the use of a headset, and he was given the use of a computer with a "realtime feed" from the court reporter so he could follow the proceedings as they occurred. The judge stated, "Now, throughout the trial, I was well aware of Mr. Slape's stated hearing deficiencies, and being so aware and advised, I did purposely and intentionally throughout the proceeding observe Mr. Slape; and I had a direct view of Mr. Slape at the table throughout the proceedings, and viewing him as I did and again emphasizing 'purposely and intentionally' regarding the hearing issue, I saw Mr. Slape viewing the realtime reporting, and he appeared to be, to my observation, reading along with the realtime." The judge also noted that he had also seen defendant using the headset on occasion, and that he "would look at the examiners, and he would act—nod and act in conformance with the questions and answers. [¶] So I had absolutely no belief that Mr. Slape was not fully participating in the proceedings throughout." As to the testimony of Dr. Podboy, the court noted that trial counsel had been "persistent" in

---

[5] Defendant's new attorney, James, argued, "It's very difficult to prepare a declaration and then send it to the attorney, the trial attorney, and get him to sign it. [¶] So really the only way we can proceed on that level is to have him subpoenaed and have him subject to live testimony."

7

trying to offer that testimony and that the court's own research had persuaded it that the testimony was inadmissible.

The trial court denied probation and sentenced defendant to a six-year term for count one, an additional one-year term for count two, and a concurrent 180-day term for count three, for a total term of seven years.

## II.  DISCUSSION

### A.  Exclusion of Evidence

Defendant contends the trial court abused its discretion in excluding evidence by two proposed experts, Dr. Podboy, a clinical and forensic psychologist, and Dr. Harry Friedman, a doctor of osteopathy.

#### 1.  *Background*

Defendant sought to introduce the testimony of Dr. Podboy at trial on "the issue of perception and memory as affected by prior trauma."  According to defense counsel's declaration, the expert testimony would "inform the jury of various psychological factors that affect perception and the reliability of memory."  This included an explanation that "current perceptions can be affected by psychological experiences at the time of the event," and that "[m]emory of current perceptions will be influenced by intrusive past feelings regarding similar events."  The expert would also testify that massage could cause flashbacks of memories of past sexual assaults and a person might confuse memories and past and current events.  Dr. Podboy was also expected to testify that trigger point massage causes referred pain, and that trigger points "usually send their pain to some other site."

It appears that both Doe One and Doe Two had suffered sexual assault in the past. In argument to the trial court, defense counsel described the nature of Dr. Podboy's anticipated evidence about Doe One as follows:  "We need testimony that posttraumatic stress sufferers can relive these past memories and can have confusion with these memories.  [¶]  Also that's going to be clear that she was in a great deal of pain, and I think we need evidence that stressors such as pain can cause the memory and the mind to relive these events that are associated with this pain, and we need expert opinion

8

regarding that fact. [¶] We have the issue of psychotic transference, where she sees things that are just not true. And he can testify that it's not unusual for people who have posttraumatic stress disorder to have a psychotic transfer where she imagines things or has delusions about what reality is all about. [¶] . . . [¶] There's evidence from her doctor that she was being treated, that she has sexual abuse in her history and that she's suffering from posttraumatic stress from that injury. She has anxiety and depression as well. [¶] All of those are going to affect her ability to perceive, and it's these unresolved psychological problems that she has [that] can be taken out against Darrell Slape, that she has these incidents in her background where she was assaulted sexually. [¶] She wants to regain control over her life, and psychologically replaces Darrell Slape as those abusers in the past and takes out her anger and her hostility against him. [¶] All of those are issues that Dr. Podboy can address." Defense counsel also informed the court that Doe Two suffered from spina bifida, that the condition could impair thinking and memory, and that Dr. Podboy would testify about those effects.

Defendant sought to introduce Dr. Friedman's testimony "regarding referred sensation in the massage experience from trigger-point massage." His counsel explained that referred sensation meant that "a touching in one part of the body will cause a sensation in another part of the body."

The court excluded the testimony of Dr. Podboy and Dr. Friedman, reasoning that the question of whether people can misperceive events was within the province of the jury and was not an appropriate subject of expert testimony. The court also concluded that a theory that massage released past memories was "a, quite frankly, stretch," but told defense counsel each of the victims could be questioned about how other massages had affected them.

During the court's ruling, defense counsel twice tried to present further argument about the admissibility of Dr. Podboy's testimony, but the trial court refused to hear it. Defense counsel again raised the issue of whether expert testimony on referred sensation would be allowed, and the trial court ruled it inadmissible, stating it was "a stretch for . . . expert testimony."

9

*2. Discussion*

"[E]xpert psychiatric testimony may be admissible to impeach the credibility of a prosecution witness where the witness' mental or emotional condition may affect the ability of the witness to tell the truth. The admissibility of such testimony rests within the discretion of the trial court. Generally, however, *attempts to impeach a prosecution witness by expert psychiatric testimony have been rejected* [citations], except in certain sex offense cases." (*People v. Cooks* (1983) 141 Cal.App.3d 224, 302 (*Cooks*), italics added.)[6] As our high court has explained, "*there is a 'judicial policy disfavoring attempts to impeach witnesses by means of psychiatric testimony*. [Citations.] California courts have viewed such examinations with disfavor because " '[a] psychiatrist's testimony on the credibility of a witness may involve many dangers: the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify the issues; the testimony may be distracting, time-consuming and costly.' " ' " (*People v. Chatman* (2006) 38 Cal.4th 344, 375–376 (*Chatman*), italics added; see also *People v. Alcala* (1992) 4 Cal.4th 742, 781, *People v. Marshall* (1996) 13 Cal.4th 799, 835 (*Marshall*)).

In excluding the proffered expert testimony of Dr. Podboy, the trial court relied explicitly on the rule of *Chatman*, *Marshall*, and *Cooks* that attempts to impeach witnesses through psychiatric testimony are disfavored. We see no abuse of discretion in this ruling. Dr. Podboy had no personal knowledge of either Doe One or Doe Two, and

---

[6] The court in *Cooks* went on to note that section 1112, which postdated the sex offense cases mentioned, prohibited the trial court from ordering the victim in a sexual assault prosecution to submit to a psychiatric or psychological examination in order to assess his or her credibility. (*Cooks*, *supra*, 141 Cal.App.3d at p. 302, fn. 61; see also *People v. Anderson* (2001) 25 Cal.4th 543, 575 [section 1112 overruled cases allowing psychiatric examination of complaining witness in sex-crime case to assist in evaluating witness's credibility].)

10

his general testimony on the possible effects of sexual trauma on memory raises several of the concerns enumerated in *Chatman*: the jury might place too much reliance on opinions Dr. Podboy had formed without even examining Doe One or Doe Two, the testimony could be so speculative as to cloud the issues, and presentation of the evidence could be distracting and time-consuming.

Nor do we see any abuse of discretion in excluding the evidence of Dr. Friedman. In any case, even if he should have been allowed to testify about referred sensation, defendant was able to elicit testimony on this subject when cross-examining two of the People's own witnesses, as well as to present it in his own testimony. Defendant has not shown he was prejudiced by the trial court's ruling.

## B. Ineffective Assistance of Counsel During Trial

Defendant contends he was deprived of effective assistance of counsel through his attorney's failure to call or effectively interview Dr. Podboy and Dr. Friedman. In support of defendant's motion for a new trial, Dr. Podboy stated in a declaration that defendant's trial counsel appeared to have little knowledge of the psychological histories of the victims, that he did not show interest when Dr. Podboy suggested he investigate spina bifida, and that he did not appear to have read the research materials provided by Marsha Yates, a friend who was helping defendant in the case. Yates submitted a declaration stating that trial counsel did not seem aware of the issues related to spina bifida, that he said Podboy was "tainted" as a witness, and that he had not heard defendant's version of events. Dr. Friedman stated in his declaration that he spoke with trial counsel once on the phone and received correspondence from him, but otherwise had little contact with him about the details of his proposed testimony.

"Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result." (*People v. Dennis* (1998) 17 Cal.4th 468, 540.) "A court must indulge a strong

11

presumption that counsel's acts were within the wide range of reasonable professional assistance." (*Id*. at p. 541.) "Reviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442.) Moreover, "[i]f a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Mayfield* (1997) 14 Cal.4th 668, 784.) Prejudice is established when counsel's performance " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*Ibid*., quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686.) Prejudice must be proved as a demonstrable reality, not simply speculation. (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Defendant has not met his burden to show his counsel's failure to inquire further of the proposed expert witnesses or to call them at trial prejudiced him. Trial counsel adequately informed the trial court of the substance of Dr. Podboy's proposed testimony, and argued vigorously for its admission. Based on its own analysis of the law, the trial court ruled the evidence inadmissible. Trial counsel also explained that Dr. Friedman would testify about referred sensation. It would be pure speculation to conclude that the trial court would have admitted the testimony of either proposed expert if trial counsel had prepared more thoroughly. Moreover, as we have noted, defendant was able to elicit from two prosecution witnesses testimony that pressure in one part of the body during massage could cause sensation in another part of the body, including painful and pleasurable sensations in the genitals. Because defendant has not shown prejudice, we need not consider whether his counsel's performance was in fact deficient.

## C. Motion for New Trial

### 1. *Motions to Continue*

As we have explained, defendant was convicted on May 29, 2012, and sentencing was originally set for August 3, 2012. In early July 2012, defendant filed a substitution

of counsel,[7] and his new counsel, Duncan James, sought to continue the sentencing in order to receive and review trial transcripts and prepare a motion for a new trial. By August 16, 2012, James had received all but one of the trial transcripts. The trial court granted three continuances, the final one until September 14, 2012. Defendant contends that by refusing to grant a longer continuance, the trial court deprived him of the effective assistance of his counsel.

"Under section 1050, subdivision (e), '[a] "trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial. [Citation.] A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence." [Citation.] Such discretion "may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." [Citation.] "To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges." [Citation.]' [Citation.] '[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 934 (*Alexander*).)

In *Alexander*, the jury reached its penalty phase verdict on March 18, 1996, and a hearing on a motion for new trial was set for April 23 (later than the date defense counsel had suggested). On March 22, defendant filed a motion for release of the jurors' identifying information so his counsel could interview the jurors to determine whether misconduct had occurred that could form the basis of a new trial motion. The trial court denied the motion on April 11. (*Alexander*, *supra*, 49 Cal.4th at p. 933.) Defendant then moved for a continuance of the new trial motion on the ground that his counsel would not be prepared to file the motion due to his health and time spent working on another matter. (*Ibid*.) The trial court denied the request, expressing concern that the matter proceed without further unwarranted delay, and finding that five weeks was sufficient time to

---

[7] The trial court stated that new counsel had been retained on June 13, 2012.

13

prepare a new trial motion. (*Id*. at pp. 933–934.) Our Supreme Court found no abuse of discretion in this ruling, concluding that defendant had a reasonable period of time to file a new trial motion and reasoning that defense counsel could have prepared other aspects of a new trial motion even while awaiting a decision on the motion for disclosure of juror information. (*Id*. at p. 935; see also *People v. Snow* (2003) 30 Cal.4th 43, 77, 92 [no abuse of discretion in denying continuance to investigate theory for new trial motion, where defendant had more than two months after verdict to investigate theory and no explanation of why records had not been investigated earlier].)

We similarly conclude the trial court did not abuse its broad discretion. The hearing on the motion for new trial and the sentencing took place three and a half months after the jury rendered its verdicts, and more than two months after defendant hired his new counsel. In the meantime, the trial court granted three continuances to allow time to prepare a new trial motion. Much of the factual support for the expanded new trial motion was drawn from declarations of the proposed expert witnesses and Marsha Yates, declarations that did not rely on the transcript of proceedings and were presumably available through diligent investigation while defense counsel waited for the remainder of the trial transcripts. In the circumstances, we cannot conclude defendant did not have a reasonable opportunity to prepare his new trial motion (see *People v. Sakarias* (2000) 22 Cal.4th 596, 647) or that the trial court's rulings were unreasonable and arbitrary.

### 2. *Denial of Motion for New Trial*

Defendant contends the trial court abused its discretion by denying the motion for new trial without allowing him to examine his trial counsel, Schultz, in an evidentiary hearing. For this proposition, he relies on *People v. Stewart* (1985) 171 Cal.App.3d 388 (*Stewart*), overruled on another ground in *People v. Smith* (1993) 6 Cal.4th 684, 696, and *People v. Dennis* (1986) 177 Cal.App.3d 863 (*Dennis*). The defendant in *Stewart* had asked his trial counsel to argue his own incompetence as a ground for a new trial. (*Stewart*, 171 Cal.App.3d at pp. 391, 393.) At an *in camera* hearing, the defendant told the court he felt he was inadequately represented because his trial counsel had failed to call certain witnesses. (*Id*. at p. 394.) The trial court denied the motion. (*Ibid*.) On the

14

facts of that case, the Court of Appeal reversed.  The court stated, "Where a defendant requests a substitution of new counsel after trial in order to assist in the preparation of a motion for new trial based on the inadequacy of trial counsel, we believe it imperative that, as a preliminary matter, the trial judge elicit from the defendant, in open court or, when appropriate, at an *in camera* hearing, the reasons he believes he was inadequately represented. . . . [¶] Once a trial judge is informed of the facts underlying a defendant's claim of inadequate assistance, he is then in a position to intelligently determine whether he may at that point fairly rule on the defendant's motion for a new trial, or whether new counsel should be appointed to more fully develop the claim of inadequate representation." (*Id*. at pp. 395–396.)  The Court of Appeal concluded that as to one of the witnesses defendant claimed should have been called, the trial court was in a position to evaluate the materiality of that testimony and correctly ruled it did not warrant a new trial.  (*Id*. at p. 397.)  As to the other two, though, the record did not disclose what their testimony would have been, and the trial court's failure to inquire into their expected testimony was error.  (*Id*. at p. 398.)  The matter was remanded for the trial court to inquire more fully into the basis for the motion for new trial and either appoint new counsel or grant the motion if the defendant presented a colorable claim of ineffective assistance; if further inquiry did not disclose a colorable claim, the motion could be denied.  (*Ibid*.)  Thus, *Stewart* considered the trial court's duty to make a careful inquiry of a defendant of the basis for his complaint about his counsel, and does not stand for the proposition that a trial court must allow a full evidentiary hearing on a motion for a new trial.

The question before the court in *Dennis* was whether the district attorney could be barred from participating in a motion for new trial based on claimed ineffective assistance of counsel.  (*Dennis*, *supra*, 177 Cal.App.3d at p. 866.)  The trial court there had granted a motion for new trial based solely on an in camera *Marsden* motion for substitution of court-appointed counsel in which the prosecutor did not participate.  (*Id*. at pp. 868, 872; *People v. Marsden* (1970) 2 Cal.3d 118.)  The Court of Appeal agreed with the People that it was error to grant the new trial without an opportunity for the

15

prosecution to present evidence or argument. (*Dennis*, *supra*, 177 Cal.App.3d at p. 872.) In doing so, the court in *Dennis* explained: "Where a defendant contends that a verdict was the result of ineffective assistance, he bears the burden of proving the claim. [Citation.] To meet this burden the defendant must prove two things: (1) that counsel failed to act as a reasonably competent attorney acting as a diligent advocate, and (2) that counsel's errors or omissions resulted in the withdrawal of a potentially meritorious defense or that it is reasonably probable a more favorable result would have occurred in the absence of counsel's failings. [Citations.] When this burden is met then the inquiry must be directed to whether there is an explanation which shows that counsel did in fact act in the manner of a diligent and conscientious advocate. [Citations.] Conduct which might appear incompetent on its face might well be explained with evidence dehors the record. [Citation.] In [*People v. Pope* (1979) 23 Cal.3d 412 (*Pope*)] and [*People v. Fosselman* (1983) 33 Cal.3d 572 (*Fosselman*)], the court recognized that claims of ineffective assistance of counsel will frequently be unresolvable on the record. In such circumstances the court expressed a preference for an evidentiary hearing where the matter may be fully explored. (*Pope*, *supra*, 23 Cal.3d at p. 426; *Fosselman*, *supra*, 33 Cal.3d at pp. 581–582.)" (*Dennis*, *supra*, 177 Cal.App.3d at p. 872.)

The cited portions of *Pope* and *Fosselman*, however, do not establish that a trial court may not rely on declarations and other documentary evidence to decide a motion for new trial based on ineffective assistance of counsel. Rather, each case recited the well-established rule that where the record does not show the basis for counsel's challenged acts or omissions, a claim of ineffective assistance is appropriately made in a petition for habeas corpus, in which there is an opportunity for an evidentiary hearing, rather than on direct appeal. (*Pope*, *supra*, 23 Cal.3d at p. 426; *Fosselman*, *supra*, 33 Cal.3d at pp. 581–582.)

Indeed, as our high court explained in *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 201 (*Zamudio*), " 'There is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony.' [Citation.] [¶] . . . California law

16

affords numerous examples of a trial court's authority, in ruling upon motions, to resolve evidentiary disputes without resorting to live testimony." Among the cases the court cited with approval was *People v. Cox* (1991) 53 Cal.3d 618, 697 (*Cox*) (disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22), which it characterized as holding that "whether to conduct live hearing on new trial motion alleging juror misconduct is within court's discretion." (*Zamudio*, *supra*, 23 Cal.4th at p. 201.) *Cox*, in turn, explained that in an earlier case, *People v. Hedgecock* (1990) 51 Cal.3d 395, 415–416, the court had concluded that an evidentiary hearing on a motion for new trial made on the ground of juror misconduct " 'should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact.' " (*Cox*, at p. 697; *accord*, *People v. Williams* (1997) 16 Cal.4th 635, 686.)

We see no reason to apply a different rule here. The trial court was in a position to see and evaluate the performance of trial counsel, as well as the effect any alleged deficiencies may have had on the outcome of the trial. (See *People v. Wallin* (1981) 124 Cal.App.3d 479, 483 [trial judge best situated to determine competency of trial counsel].) We recognize that some of the claimed incompetency was based on counsel's actions away from the courtroom, such as his alleged failure to interview the expert witnesses properly. However, the trial court made clear that it excluded the testimony of Dr. Podboy based on its own review of the law. Moreover, defendant submitted declarations of Dr. Podboy and Dr. Friedman in support of the motion for new trial, as well as the declaration of Marsha Yates, and the trial court was in the best position to determine whether its rulings on the admissibility of evidence would have been any different if that information had been before it during the trial. In the circumstances, we find no abuse of discretion in the trial court's ruling on the motion for new trial without allowing the live testimony of trial counsel.

### D. Hearing Accommodations

Defendant contends the accommodations made for his hearing disability deprived him of a fair trial. (*People v. Guillory* (1960) 178 Cal.App.2d 854, 861 [trial judge

17

should afford deaf defendants reasonable facilities for confronting and cross-examining witnesses].)  The requirement of reasonable accommodations has been codified in Civil Code section 54.8, which requires trial court to provide, upon request, "a functioning assistive listening system or a computer-aided transcription system."

Our high court considered and rejected a similar contention in *People v. Freeman* (1994) 8 Cal.4th 450, 479–480 (*Freeman*).  The defendant there had hearing difficulties, and counsel and the trial court took repeated steps to resolve the problem:  the court ordered medical treatment when the defendant requested it and made sure he got batteries for his hearing aids, and the defendant was given a daily transcript of the proceedings. (*Id*. at p. 479.)  Moreover, "except for a few scattered early occasions, whenever defendant was spoken to he responded with no apparent hearing difficulty." (*Ibid*.)  Even if he occasionally failed to hear something, the high court reasoned, there was no reason to assume he missed anything of significance or could not participate effectively in the proceedings.  (*Ibid*.)

The trial court here was aware that defendant needed accommodations for his hearing disability, and provided them.  As the court explained in denying the motion for new trial, defendant was in fact provided with both the accommodations specified in Civil Code section 54.8.  He was able to view a computer-aided transcription system, a "realtime feed," and he had the use of a  headset, although he asserted in his motion for new trial that it did not allow him to hear voices adequately.  The trial judge also stated that he was aware of defendant's hearing difficulties and as a result "did purposely and intentionally throughout the proceeding observe Mr. Slape," and that he appeared to be reading along to the realtime.  When he was testifying, defendant said on a few occasions that he could not hear a question, but otherwise responded to questions posed by counsel, and the trial judge stated that in his opinion, defendant had "no trouble hearing or answering any of the questions asked in an appropriate witness-to-examiner response, none."  Here, as in *Freeman*, defendant has not shown he was prejudiced or denied a fair trial.  (*Freeman*, *supra*, 8 Cal.4th at pp. 479–480.)

18

### E. Cruel and Unusual Punishment

Defendant contends his seven-year sentence—the six-year mid-term for count one and an additional one-year term for count two—constituted cruel and unusual punishment. This is so, he argues, because he is 73 year old, he "displayed many good qualities," he "believed his actions were medically beneficial to the Jane Does," and he had no prior criminal record. Moreover, he contends, the trial court relied on a probation report that was incomplete because, on the advice of counsel, he did not discuss the charges with the probation officer while his new trial motion was pending.

We may dispose quickly of defendant's claim that the sentence was improper because he believed his actions were medically beneficial to his victims. The jury decided otherwise when it found him guilty, and there is substantial evidence to support its verdict. Nor has defendant persuaded us that the presentence report was inadequate because he had not yet discussed the crimes with the probation officer. A presentence report must include the defendant's statement only " 'if one is given' " (*People v. Goodner* (1992) 7 Cal.App.4th 1324, 1330–1331; see also Cal. Rules of Court,[8] rule 4.411.5(a)(4)), and defendant chose not to give one.

The standards for evaluating a claim that a sentence constitutes clear and unusual punishment are well established. "A punishment is excessive under the Eighth Amendment if it involves the 'unnecessary and wanton infliction of pain' or if it is 'grossly out of proportion to the severity of the crime.' [Citation.] A punishment may violate article I, section 17 of the California Constitution if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.] [¶] In determining whether a particular punishment is cruel and/or unusual, courts examine the nature of the particular offense and offender, the penalty imposed in the same jurisdiction for other offenses, and the punishment imposed in other jurisdictions for the same offense." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 199.) Defendant makes no claim that his sentence is

---

[8] All rule references are to the California Rules of Court.

disproportionate to either the penalty imposed in California for other offenses or the punishment imposed in other states for the same offenses.

We see no gross disproportion between defendant's offenses and his sentence. The trial court discussed the aggravating and mitigating factors: As aggravating factors, the victims were both vulnerable in that they were in pain and seeking treatment (Cal. Rules of Court, rule 4.414(a)(3)); each victim suffered emotional trauma (rule 4.414(a)(4)); defendant was an active participant (rule 4.414(a)(6)); and defendant acted in a sophisticated manner by engaging the victims in extensive discussions about pain and took advantage of a position of trust when his victims were unrobed (rule 4.414(a)(8) & (9)). The court also expressed concern that the testimony of M.G. indicated defendant had a long history of sexual misconduct, and that at the time of his crime against Doe Two, the charges relating to Doe One were already pending. In mitigation, the court noted that defendant had no prior criminal record (rule 4.414(b)(1)); the court also noted defendant's advanced age, poor health, and the fact that a methodology for evaluating future risk, the Static-99, indicated a low risk of reoffense. These factors are supported in the record, and support the trial court's decision to deny probation and sentence defendant to the mid-term for count one and a consecutive term for count two.[9]

---

[9] Because we reject each of defendant's claims of error, we also reject his claim that cumulative error requires reversal.

## III.   DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Humes, J.